## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 08-22817-CIV-MOORE

MICHAEL ALLEN GRIFFIN,

        Petitioner,

v.

WALTER A. MCNEIL,

        Respondent.

_____/

## ORDER DENYING PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

THIS CAUSE came before the Court upon Petitioner's Amended Petition for Writ of Habeas Corpus by a Person in State Custody (dkt # 17).

UPON CONSIDERATION of the Motion, the Response, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following order.

## I.   BACKGROUND

    A.   Factual History

On April 27, 1993, Michael Allen Griffin ("Griffin"), Samuel Velez ("Velez") and Nicholas Tarallo ("Tarallo") decided to commit a burglary.[1] They left Tarallo's apartment in Griffin's father's Cadillac and drove to the location of a white Chrysler LeBaron where they switched cars. Griffin had previously stolen the Chrysler, and he used the vehicle during burglaries. Once in the Chrysler, the three proceeded to search for an appropriate target. After

---

[1]   The facts of the case, which are largely undisputed, are recounted by the Florida Supreme Court in Griffin's direct appeal. Griffin v. State of Florida, 639 So. 2d 966 (Fla. 1994).

driving around, the trio approached an apartment building in Broward County. Nothing happened at this location, and as they left, Griffin suggested they go to the Holiday Inn Newport where Griffin had completed successful burglaries in the past. Upon arriving at the Holiday Inn, Griffin and Velez exited the car, entered a hotel room, and stole a cellular phone and purse. The three then left the Holiday Inn. Tarallo drove while Griffin and Velez divided the stolen property.

While leaving the Holiday Inn and returning to the Cadillac, the three observed a police car. Griffin panicked and told Tarallo to turn, speed up, and turn several more times. During these maneuvers, another police car, driven by Officers Martin and Crespo, spotted the Chrysler, noticed the three men acting suspiciously, and began to follow. At this point, Tarallo tried to pull over but Griffin stated that he would not go back to jail and ordered Tarallo to continue to evade the police. Finally, Tarallo was able to pull over and attempted to exit the vehicle. As he got out, Griffin began shooting at the police, killing Officer Martin. After an exchange of gunfire, Tarallo and Velez exited the vehicle and surrendered to Officer Crespo. Griffin fled in the Chrysler and was eventually apprehended.

B.     Procedural History

Griffin was charged with first-degree murder of a law enforcement officer (Officer Martin), the attempted first-degree murder of a law enforcement officer (Officer Crespo), the burglary of the Holiday Inn room, two counts of grand theft (one involving the Chrysler LeBaron and one involving the items stolen from the hotel room), and one count of unlawful possession of

a firearm by a convicted felon.[2] (App. X, Vol. 1 at 1-4). After a jury trial, Griffin was convicted on all counts. (App. X, Vol. 3 at 489-91).

After the sentencing phase, the jury recommended death by a vote of ten to two. (App. X, Vol. 3 at 497-513). In his sentencing order, the trial judge found the following aggravating factors: (1) previous conviction of a felony involving violence (the attempted murder of Officer Crespo); (2) the capital felony was committed while the defendant was engaged in the commission of a burglary; (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest; and (4) the murder was cold, calculating, and premeditated. § 921.141(5)(b), (d), (e), (i), Fla. Stat. (1991). (App. X, Vol. 3 at 502-09). In mitigation, the court found that Griffin was twenty years old at the time of the murder, had shown remorse, had a traumatic childhood, and had a learning disability. (App. X, Vol. 3 at 509-11). The judge determined that the aggravators outweighed the mitigators and followed the jury recommendation by sentencing Griffin to death. (App. X, Vol. 3 at 497-513). On July 7, 1994, the Florida Supreme Court affirmed Griffin's sentence on direct appeal. Griffin v. State of Florida, 639 So. 2d 966 (Fla. 1994). Griffin sought certiorari review in the United States Supreme Court, which was denied on March 6, 1995. Griffin v. Florida, 514 U.S. 1005 (1995).

On March 19, 1997, Griffin filed a motion for post-conviction relief under *Florida Rules of Criminal Procedure* 3.850 in the Circuit Court of the Eleventh Judicial Circuit in and for Dade County, Florida (the "state court"). (App. Y, Vol. 5 at 21-54). The motion stated that it was

---

[2]     Tarallo pled guilty to second-degree murder, attempted first-degree murder, burglary, and two counts of grand theft. He received a thirty-year sentence and testified against Griffin.

3

incomplete but that its purpose was to toll the time to file a petition in federal court under 28 U.S.C. § 2254. (Id. at 22). On October 29, 1998, Griffin filed an amended motion for post-conviction relief, which also stated that the motion was incomplete. (App. Y, Vol. 6 at 257-353). On December 10, 1999, Griffin filed another amended motion for post-conviction relief, which raised thirty one claims. (App. Y, Vol 1 at 32-167). On May 5, 2000, the state court entered an order denying all but two of the claims. (App. Y, Vol. 1 at 251-55). On January 10, 2001, the state court dismissed the two remaining claims. (App. Y, Vol. 2 at 257-62). On September 25, 2003, the Florida Supreme Court affirmed the denial of Griffin's motion for post-conviction relief. Griffin v. State of Florida, 866 So. 2d 1 (Fla. 2003). The mandate issued on March 1, 2004. (App. JJ). Griffin sought certiorari review in the United States Supreme Court, which was denied on November 1, 2004. Griffin v. Florida, 543 U.S. 962 (2004).

While Griffin's appeal from the denial of his first motion for post-conviction relief was still pending, Griffin retained counsel who replaced the counsel that the state had appointed to represent him. (App. HH). On June 20, 2003, Griffin's former state appointed counsel filed a second motion for post-conviction relief in the state court. (App. Z, Vol. 1 at 79-103). On June 3, 2004, the court found that it lacked jurisdiction over the second motion and that Griffin's former counsel was not in a position to file the motion because he no longer represented Griffin. (App. Z, Vol. 4 at 35-36). The court granted the dismissal nunc pro tunc to October 17, 2003, the date on which the court orally granted the State's Motion to Dismiss. (Id.) On June 24, 2004, Griffin filed a pro se notice of appeal of the denial of the second motion for post-conviction relief. (App. MM). On January 20, 2005, the Florida Supreme Court issued an order

4

affirming the dismissal of the successive motion, but gave Griffin leave to refile his second

motion for post-conviction refile. Griffin v. State, 894 So. 2d 970 (Fla. 2005) (quoted in dkt #

21, at 4). The January 20, 2005, Order also stated that Griffin's refiling would be nunc pro tunc

to June 20, 2003, the original filing date of his second motion for post-conviction relief. Id.

Griffin refiled his second motion for post-conviction relief on February 21, 2005, which

contained two grounds for relief. (App. Z, Vol. 1 at 39-40).

      On March 7, 2005, Griffin filed a motion to substitute his counsel for new counsel he had

retained. The same day, he filed a third motion for post-conviction relief which raised three

grounds for relief. (App. Z, Vol. 1 at 104-30). Two of the grounds were identical to the two

counts in the second refiled motion. Griffin characterized this motion as a refiling of the

dismissed second motion for post-conviction relief. (Id. at 106). The State moved to strike the

motion on grounds that it was an improper attempt to amend the refiled second motion for post-

conviction relief. (App. Z, Vol. 2 at 138-51). The court struck count three and granted Griffin

time to file a motion to amend.[3] (App. Z, Vol. 3 at 407-09).

      Griffin filed a motion to amend, which the State contested. (App. Z, Vol. 2 at 242-46).

At a hearing on April 15, 2005, Griffin did not appear. (App. Z, Vol. 3 at 382). The court reset

the matter for April 29, 2005, and instructed the clerk to provide notice to Griffin. (Id. at 382-

83). At the next hearing, Griffin again did not appear. On May 13, 2005, the court held a

hearing, denying Griffin leave to amend and denying the refiled motion for post-conviction relief.

---

      [3]    After the striking of count III, the third motion for post-conviction relief was identical to the
second refiled motion. Because the motions were identical, this Court will refer to the second refiled
motion and the third motion simply as the third motion for post-conviction relief.

(App. Z, Vol. 3 at 386). Griffin did not appear at this hearing. (Id.) On the same day, the court entered a written order explaining the grounds for its denials of Griffin's motions. (App. Z, Vol. 2 at 276-80). On July 19, 2006, the court vacated the May 13, 2005, order, finding that Griffin had not received proper notice of the hearings. (App. Z, Vol. 3 at 475-82). On July 20, 2006, the court entered a new order denying the refiled motion for post-conviction relief. (App. Z, Vol. 3 at 442). On July 20, 2006, the court also entered a separate order denying Griffin's motion to amend. (App. Z, Vol. 3 at 440). On August 2, 2006, Griffin filed a motion for rehearing of the order denying his motion to amend. (App. Z, Vol. 3 at 447). The motion for rehearing was denied on August 7, 2006, and rendered on August 9, 2006.[4] (App. Z, Vol. 3 at 447). On September 1, 2006, Griffin filed a notice of appeal of the denial of his motion for post-conviction relief and motion to amend. (App. Z., Vol. 3 at 460-61).

On May 8, 2006, Griffin filed a petition for belated appeal of the May 13, 2005, denial of Griffin's motion for leave to amend and denial of the refiled motion for post-conviction relief. (App. P). The Florida Supreme Court granted the petition for belated appeal on December 28, 2006, and treated the September 1, 2006, notice of appeal as part of the belated appeal. (App. NN). On June 2, 2008, the Florida Supreme Court affirmed the denial of Griffin's motion to amend and affirmed the denial of Griffin's motion for post-conviction relief. Griffin v. State of Florida, 992 So. 2d 819 (Fla. 2008). On June 18, 2008, Griffin filed a motion for rehearing.

---

[4] Florida Rule of Appellate Procedure 9.020 defines rendition of an order as occurring when "a signed written order is filed with the clerk of the lower tribunal." See State v. Green, 527 So. 2d 941, 942 (Fla. 2d DCA 1988) (noting that it is common practice for the clerk to use a stamp or other instrument to mark a document with the exact date and time of filing).

(App. UU).  On September 3, 2008, the Florida Supreme Court denied Griffin's motion for

rehearing.  (App. V).

Griffin filed a Petition for Writ of Habeas Corpus by a Person in State Custody (dkt # 1)

in this Court on October 8, 2008.[5]  Griffin filed an Amended Petition for Writ of Habeas Corpus

by a Person in State Custody (dkt # 17) on April 3, 2009, which raised nine grounds for relief.[6]

---

[5]  On July 7, 2004, Griffin filed with this Court a pro se motion titled "Motion to Initiate Petitioner's 28 U.S.C. § 2254 Petition and for Appointment of Counsel Pursuant to 18 U.S.C. § 3001 et seq. and 21 U.S.C. § 848 et seq. for Representation in Capital Federal Habeas Corpus Proceedings." (dkt # 1, Case No. 04-21643-MARRA).  Counsel for Griffin filed an appearance on February 22, 2005, advising the Court that Griffin already had counsel who had been appointed by the State to pursue all post-conviction remedies in federal and state court.  (dkt # 5, Case No. 04-21643-MARRA).  On April 25, 2005, the Court entered an Order (dkt # 8, Case No. 04-21643-MARRA) denying the motion and holding that Griffin's motion requesting counsel did not initiate federal habeas proceedings.

[6]  The grounds for relief include:
I) Griffin received ineffective assistance of counsel at the penalty phase of his capital trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution;

II) The sentencing court did not independently consider and weigh the aggravating and mitigating factors in violation of due process and the Eighth Amendment.  Additionally, trial counsel was ineffective for failing to object at the time of sentencing;

III) Griffin was denied the effective assistance of counsel at the guilt phase of his capital trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution;

IV) The use of nonstatutory aggravators and other improper prosecutorial argument deprived Griffin of his Constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and renders his sentence to death unconstitutional.  Trial counsel rendered ineffective assistance of counsel in failing to object to improper arguments made by the prosecution;

V) The trial court erred in preventing the defense from eliciting testimony of his remorse, which constitutes a valid mitigating factor to be considered by the sentencer as providing a basis for a life sentence;

VI) Griffin's death sentence is predicated upon an aggravating circumstance that was applied in a vague and overbroad fashion when it was used to support a sentence of death even though the judge had specifically found that the jury probably did not find premeditation, but instead convicted on the basis of felony murder in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution;

VII) Griffin's death sentence is predicated upon an improper automatic aggravator and thus violates the

On November 21, 2008, Griffin filed a motion with the Florida Supreme Court captioned
"Petition to Invoke this Court's All Writs Jurisdiction and/or Petition for Writ of Habeas
Corpus," raising four claims of ineffective assistance of appellate counsel. (App. U). The State
filed a Response, to which Griffin filed a Reply. The motion is currently pending before the
Florida Supreme Court.

## III.   STANDARD OF REVIEW

### A.   Exhaustion and Procedural Bar

A petitioner seeking to challenge his state conviction in federal court must first "fairly
present" his federal claim to the state court before bringing the same claim in federal court. See
Picard v. Conner, 404 U.S. 270, 275 (1971). A federal claim is "fairly presented" if it is brought
to the state court's attention that the prisoner's claim is based upon the U.S. Constitution. See
Duncan v. Henry, 513 U.S. 364, 366 (1995). If the petitioner fails to "fairly present" his federal
claim to the state court prior to initiating his federal action, the claim is unexhausted. Id. When
an unexhausted claim would be barred if attempted to once again be presented in state court, a
federal court can apply the state rules and bar the claim, otherwise the exhaustion requirement
would serve no purpose. Teague v. Lane, 489 U.S. 288, 297-99 (1991). Under Florida law, a

---

Eighth and Fourteenth Amendments to the U.S. Constitution;

VIII) On appeal appellate counsel failed to raise and/or adequately raise numerous meritorious issues
which warrant reversal of Griffin's conviction and sentence of death;

IX) The existing procedure that the State of Florida utilizes for lethal injection violates the Eighth
Amendment to the U.S. Constitution as it constitutes cruel and unusual punishment.

petitioner is not permitted to file successive habeas corpus petitions that seek the same relief as an earlier petition if the successive petition is based upon circumstances that were known or should have been known when the previous petition was filed. See Johnson v. Singletary, 647 So. 2d 106, 109 (Fla. 1994). If a petitioner's claim is procedurally barred by state law, the exhaustion requirement "provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." See Gray v. Sutherland, 518 U.S. 152, 162-63 (1996) (internal citations omitted). For any defaulted claim, the petitioner bears the burden of proving cause and prejudice so as to receive federal habeas review.

B.      Federal Review of State Court Determinations

Under 28 U.S.C. § 2254, this Court presumes that all of the state courts' factual determinations are correct. The petitioner has the burden of rebutting this presumption by clear and convincing evidence. See 28 U.S.C. § 2254 (e)(1) (1996). Section 2254 also requires that a reviewing court shall not grant:

> an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court . . . with respect to any claim that was adjudicated on the merits in State Court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. In Williams v. Taylor, the Supreme Court examined the two grounds that permit the granting of a writ of habeas corpus. 529 U.S. 362, 412-13 (2000). The Supreme Court explained the

9

"contrary to" and "unreasonable" language as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the
> state court arrives at a conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case differently than this Court has
> on a set of materially indistinguishable facts. Under the "unreasonable
> application" clause, a federal habeas court may grant the writ if the state court
> identifies the correct governing legal principle from this Court's decisions but
> unreasonably applies that principle to the facts of the prisoner's case.

Id. When the Supreme Court mandates that an unreasonable application of law to facts warrants

granting a writ of habeas corpus, the Court is referring to an objectively unreasonable standard.

Id. at 410.

Therefore, this Court reviews Griffin's Amended Petition for whether the state courts'

actions "were contrary to, or an unreasonable application of, clearly established federal law" or

whether the state courts engaged in an unreasonable factual finding. This Court is empowered to

review the state courts' decisions to reject Griffin's claims even if the state court did not provide

an explanation for its decision. See Isaacs v. Head, 300 F.3d 1232, 1258-60 (11th Cir. 2002).

Finally, should this Court determine that the state courts' determinations do contain some error,

this Court must decide whether the error alleged "had [a] substantial and injurious effect or

influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993);

see also Grossman v. McDonough, 466 F.3d 1325, 1339 (11th Cir. 2006) (stating "[i]n Brecht,

the Supreme Court noted the differences between the *Kotteakos* harmless error standard and the

'harmless beyond a reasonable doubt' standard, and determined that the harder-to-establish

Kotteakos formulation was more appropriate in the habeas context, which is designed to afford

relief only to those whom society has 'grievously wronged'").

C.     Statute of Limitations

A one-year statute of limitations applies to a petition for a writ of habeas corpus by a

person in state custody. 28 U.S.C. § 2244(d)(1). This statute of limitations was enacted as part

of the Anti-Terrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), effective April

24, 1996. State prisoners whose convictions became final before the AEDPA's effective date are

entitled to one year from the AEDPA's effective date to file a petition for a writ of habeas

corpus, April 23, 1997. Wilcox v. Fla. Dep't of Corr., 158 F.3d 1209, 1211 (11th Cir. 1998).

The AEDPA's effective date is used in lieu of the final conviction date indicated by applying

§ 2244(d)(1)(A). Webster v. Moore, 199 F.3d 1256, 1257 n.3 (11th Cir. 2000).

Once the AEDPA's statute of limitations begins to run, the limitations period can be

tolled through statutory tolling or equitable tolling. Brown v. Barrow, 512 F.3d 1304, 1307 (11th

Cir. 2008). The statutory tolling provision of the AEDPA provides that "[t]he time during which

a properly filed application for State post-conviction or other collateral review with respect to the

pertinent judgment or claim is pending shall not be counted toward any period of limitation under

this subsection." 28 U.S.C. § 2244(d)(2). "The doctrine of equitable tolling applies 'when a

movant untimely files because of extraordinary circumstances that are both beyond his control

and unavoidable even with diligence.'" Id. (quoting Knight v. Schofield, 292 F.3d 709, 711

(11th Cir. 2002)).

11

## III.    ANALYSIS

### A.    AEDPA Statute of Limitations

#### 1.    One-Year from the AEDPA's Effective Date

Griffin's conviction became final on March 6, 1995, the date the United States Supreme

Court denied his certiorari petition. See Melson v. Allen, 548 F.3d 993, 997 (11th Cir. 2008).

Griffin had one year from the AEDPA's effective date of April 24, 1996, to file his federal

habeas petition because his conviction became final before that date.[7]  Griffin filed his first

motion for post-conviction relief on March 19, 1997, which was 330 days after the AEDPA's

one-year statute of limitations began running.

The statute of limitations began tolling on March 19, 1997, and tolled until March 1,

2004, the date the Florida Supreme Court issued the mandate on the order affirming the denial of

Griffin's first motion for post-conviction relief.  The AEDPA's statute of limitation tolls while a

motion for post-conviction relief is pending in state court.  28 U.S.C. § 2244(d)(2).  In Florida, a

post-conviction motion is pending until the appellate court denies rehearing on its affirmance of

the lower court's denial of the motion for post-conviction relief.  Moore v. Crosby, 321 F.3d

1377, 1380 (11th Cir. 2003).  On March 1, 2004, the Florida Supreme Court issued the mandate

on the order affirming the denial of Griffin's motion for post-conviction relief.  (App. JJ); see

Griffin v. State of Florida, 866 So. 2d 1 (Fla. 2003).

---

[7]    "Petitioners whose convictions became final prior to the AEDPA's effective date of April 24, 1996, as here, had until April 23, 1997, to file their habeas petitions." Folan v. McDonough, 223 Fed. Appx. 881, 882 (11th Cir. 2007).  Accordingly, April 24, 1996, is counted when determining how many days have elapsed since the statute of limitations has been triggered.

At the time when the Florida Supreme Court issued its March 1, 2004, order, Griffin had already filed his second motion for post-conviction relief, which was filed on June 20, 2003. Although this motion was improperly filed and dismissed for lack of jurisdiction, Griffin was granted leave to refile the motion nunc pro tunc to June 20, 2003. Therefore, independent of the tolling that occurred while the first motion for post-conviction relief was pending, the statute of limitations was tolled because Griffin's motion for post-conviction relief was pending as of June 20, 2003.

The statute of limitations was tolled from June 20, 2003, until September 3, 2008, the date the Florida Supreme Court denied Griffin's motion for rehearing, with the exception of one day that the statute of limitations ran on June 18, 2008. In Florida, a petitioner has 15 days from the rendition of an order to file a motion for rehearing. Fla. R. Crim. P. 3.851(f)(7). A petitioner has 30 days from rendition of an order to appeal an order denying post-conviction relief. Fla. R. Crim. P. 3.850(g). If a petitioner timely files a motion for rehearing or notice of appeal of an order denying the petitioner's motion for post-conviction relief, the period between the adverse lower court decision and the filing of the motion for rehearing or notice of appeal is not counted against the AEDPA's one-year statute of limitations. See Evans v. Chavis, 546 U.S. 189, 192 (2006); Van Zant v. Fla. Parole Comm'n, 308 Fed. Appx. 332, 335 (11th Cir. 2009); Nix v. Sec'y for Dep't of Corr., 393 F.3d 1235, 1237 (11th Cir. 2004). If a petitioner does not file a motion for rehearing or notice of appeal, the statute of limitations begins running after the expiration of the 15 or 30 day filing period and continues running until a motion for belated appeal is filed. McMillan v. Sec'y for Dept. of Corr., 257 Fed. Appx. 249, 252 (11th Cir. 2007).

13

If a petitioner files a motion for rehearing, the time for filing a notice of appeal is tolled until the motion for rehearing has been ruled on. Alexander v. Dugger, 841 F.2d 371, 373 (11th Cir. 1988) (citing Smith v. State, 390 So. 2d 813 (Fla. 5th DCA 1980)).

On May 8, 2006, Griffin filed his motion for belated appeal of the May 13, 2005, order denying his third motion for post-conviction relief. At the time Griffin filed his belated appeal, the May 13, 2005, order had not yet been vacated. However, once the May 13, 2005, order was vacated on July 19, 2006, his belated appeal pertained to an order that had been vacated, and was therefore moot, leaving only the appeal of the July 20, 2006, order denying Griffin's third motion for post-conviction relief.[8] Griffin's third motion for post-conviction relief was denied on July 20, 2006.[9] Thus, once the new order denying his third motion for post-conviction relief was entered on July 20, 2006, Griffin had 15 days to file a motion for rehearing or 30 days to file a notice of appeal.

On August 2, 2006, 13 days after the issuance of the July 20, 2006, order, Griffin filed a motion for rehearing of the order denying Griffin's motion to amend. This motion for rehearing sought rehearing on the July 20, 2006, order denying Griffin's motion to amend, but did not seek

---

[8]   On May 13, 2005, the state court denied Griffin's motion to amend and motion for post-conviction relief after Griffin and his counsel failed to appear at three consecutive hearings. This order was vacated on July 20. 2006. Even assuming, without deciding, that Griffin's absence from these hearings was attributable to something more than attorney negligence that warrants equitable tolling, this Court has found that the statute of limitations was tolled from June 20, 2003, until September 3, 2008, with the exception of one day on June 18, 2008. Thus, the argument that Griffin is entitled to equitable tolling because of a lack of notice of the hearings in April and May of 2005, is moot because the statute of limitation was tolled during the in which Griffin may have been prejudiced by a lack of notice.

[9]   The July 20, 2006, order was rendered on July 20, 2006, at 3:57 p.m., as indicated by the Clerk's time stamp on the first page of the order.

rehearing on the state court's separate order, also dated July 20, 2006, denying his motion for post-conviction relief. The motion for rehearing was denied on August 7, 2006, and rendered on August 9, 2006. Griffin filed his notice of appeal of the July 20, 2006, order denying his motion for post-conviction relief and motion to amend on September 1, 2006, 23 days after the denial of the motion for rehearing.

The statute of limitations was tolled from September 1, 2006, the date Griffin filed his notice of appeal, until 15 days after his appeal was denied on June 2, 2008, the time within which he had to file a motion for rehearing. Griffin filed a motion for rehearing on June 18, 2008, 16 days after the Florida Supreme Court denied his appeal. Despite the fact that Griffin's motion for rehearing was filed one day late, the Florida Supreme Court denied the motion on the merits without addressing the issue of timeliness. Thus, this Court construes the denial of the motion for rehearing on the merits to be an equitable extension, which extends the time to file but does not make the filing nunc pro tunc to the original filing deadline. Therefore, the statute of limitations ran for one day because a petitioner who receives an equitable extension of time to file a motion in a post-conviction proceeding which, if timely filed, would toll the AEDPA's statute of limitations, is not entitled to statutory or equitable tolling. Johnson v. Fla. Dept. of Corr., 513 F.3d 1328, 1333 (11th Cir. 2008) (citing Howell v. Crosby, 415 F.3d 1250, 1251-52 (11th Cir. 2005)). At that time, the AEDPA's statute of limitations had been running for 331 days.

Once Griffin filed his motion for rehearing, the statute of limitations was tolled until the Florida Supreme Court denied Griffin's motion for rehearing on September 3, 2008. Therefore,

15

the AEDPA's one-year statute of limitations began to run again on September 3, 2008.  Griffin

filed a Petition for Writ of Habeas Corpus by a Person in State Custody (dkt # 1) in this Court on

October 8, 2008, adding another 35 days, for a total of 366 days.[10]  Therefore, Griffin's petition is

time barred because the AEDPA's one-year statute of limitations had been running for 366 days

when Griffin filed the instant motion for habeas relief.[11]

> 2.     Section 2244(d)(1)(B)

Section 2244(d)(1)(B) does not apply to Griffin's Amended Petition for Writ of Habeas

Corpus by a Person in State Custody.  Section 2244(d)(1)(B) provides that the AEDPA's one-

year statute of limitations runs from "the date on which the impediment to filing an application

created by State action in violation of the Constitution or laws of the United States is removed, if

the applicant was prevented from filing by such state action."  28 U.S.C. § 2244(d)(1)(B).  None

of Griffin's grounds for relief constitute an "impediment to filing an application created by State

action" within the meaning of § 2244(d)(1)(B).

To the extent that any of the grounds for relief imply that Griffin's post-conviction

counsel was incompetent for failing to timely file his petitions for post-conviction relief and for

federal habeas relief, it is well settled that incompetent performance by appointed counsel "'is

---

[10]     The relevant dates pertaining to the running of the AEDPA's statute of limitations are
presented in a timeline, included as Appendix A of this Order.

[11]     It bears mentioning that while the AEDPA's one-year statute of limitations was exceeded
here by only one day, the net effect of the state court proceedings, from the time Griffin filed his first
motion for post-conviction relief on March 19, 1997, until the denial of his motion for rehearing on the
denial of his appeal of his third motion for post-conviction relief on September 3, 2008, was to toll the
AEDPA statute of limitations for over 11 years.

not the type of State impediment envisioned in § 2244(d)(1)(B).'" Johnson v. Florida Dept. of

Corr., 513 F.3d 1328, 1331 (11th Cir. 2008) (quoting Lawrence v. Florida, 421 F.3d 1221 (11th

Cir. 2005) aff'd, Lawrence v. Florida, 549 U.S. 327 (2007)); Gordon v. Sec'y, Dept.. of Corr.,

479 F.3d 1299, 1301 (11th Cir. 2007) (holding that failure of court-appointed counsel to file

more promptly is not an impediment to filing created by state court action). Moreover, prisoners

in capital cases have no constitutional right to post-conviction counsel. Johnson, 513 F.3d at

1331 (citing Lawrence v. Florida, 549 U.S. 327 (2007)). Therefore, failure of court-appointed

counsel to promptly file is not an "impediment to filing created by State court action" within the

meaning of 2244(d)(1)(B). Accordingly, § 2244(d)(1)(B) does not apply to Griffin's petition.

        3.      Section 2244(d)(1)(C)

Section 2244(d)(1)(C) does not apply to Griffin's Amended Petition. Section

2244(d)(1)(C) provides that the AEDPA's one-year statute of limitations runs from "the date on

which the constitutional right asserted was initially recognized by the Supreme Court, if the right

has been newly recognized by the Supreme Court and made retroactively applicable to cases on

collateral review." 28 U.S.C. § 2244(d)(1)(C). None of Griffin's grounds for relief are based on

a constitutional right that has been newly recognized by the Supreme Court and made

retroactively applicable on collateral review. Therefore, § 2244(d)(1)(C) does not apply to

Griffin's petition.

        4.      Section 2244(d)(1)(D)

Petitioner does not assert that Section 2244(d)(1)(D) applies to any of his claims. Upon

review of the pleadings, this Court concludes § 2244(d)(1)(D) does not apply.

5.     Equitable Tolling

Equitable tolling does not apply to Griffin's Amended Petition. "Equitable tolling may apply when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence."[12] Johnson, 513 F.3d at 1332 (internal quotation marks omitted). Equitable tolling is an extraordinary remedy which should be applied sparingly to habeas petitions so as not to "'create a loophole which is contrary to the legislative intent of insuring a greater degree of finality.'" Jones v. United States, 304 F.3d 1035, 1039 (11th Cir. 2002) (quoting Brackett v. United States, 270 F.3d 60, 69 (1st Cir. 2001)). A petitioner bears the burden of establishing equitable tolling. Johnson, 513 F.3d at 1333. "To discharge this burden, he must demonstrate: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Id. (citing Lawrence v. Florida, 549 U.S. 327 (2007)). The "extraordinary circumstances" standard focuses on the circumstances surrounding the late filing and not the merits of the underlying conviction. Helton v. Sec'y for Dept. of Corr., 259 F.3d 1310, 1314-15 (11th Cir. 2001).

Here, there are no grounds for equitable tolling. There is no extraordinary circumstance that stood in Griffin's way of timely filing his petitions for post-conviction relief or federal habeas relief. To the extent that Griffin's Amended Petition suggests that the failure of his counsel to timely file his petition constitutes an extraordinary circumstance, this claim fails. It is

---

[12]     "Although the Supreme Court has not expressly approved the application of equitable tolling to the AEDPA statute of limitations, it has recently assumed, without deciding, that equitable tolling is available in this context." Johnson, 513 F.3d at 1333 n.9. (citing Lawrence v. Florida, 549 U.S. 327, 335 (2007)).

18

well established that the AEDPA's one-year statute of limitations is not subject to equitable tolling where court-appointed counsel fails to timely file. <u>Lawrence</u>, 549 U.S. at 337 (stating that counsel's confusion about tolling during certiorari petitions, miscalculation of deadlines, and status of counsel as having been appointed and supervised by the state, were each insufficient to warrant equitable tolling); <u>Holland v. Florida</u>, 539 F.3d 1334, 1339 (11th Cir. 2008) (stating that attorney negligence is not a basis for equitable tolling). Even ignoring the fact that Griffin retained his own counsel for much of his post-conviction proceedings, his counsel's failure to file his federal habeas petition within the one-year statute of limitations does not warrant equitable tolling.

There is no evidence of egregious attorney misconduct by Griffin's counsel that would justify equitable tolling. While attorney negligence is not enough to warrant equitable tolling, "proof of bad faith, dishonesty, divided loyalty, mental impairment or so forth on the lawyer's part -- can rise to the level of egregious attorney misconduct that would entitle Petitioner to equitable tolling." <u>Id.</u> (citing <u>Downs v. McNeil</u>, 520 F.3d 1311 (11th Cir. 2008)). Given the absence of allegations or proof of activity by Griffin's counsel that rises to the level of egregious attorney misconduct, Griffin is not entitled to equitable tolling.

B.    <u>Griffin's Substantive Claims</u>

Despite the fact that Griffin's claims are time barred, this Court will nevertheless address each of his claims on the merits.

1.   Claim that He Received Ineffective Assistance of Counsel at the Penalty
     Phase of his Capital Trial

In his first claim, Griffin alleges that his counsel was ineffective for failing to adequately

investigate and prepare for trial. Griffin contends that the investigation and preparation were

inadequate because (1) Griffin's trial counsel Andrew Kassier ("Kassier") did not seek a second

chair to assist him; (2) Kassier did not interview Griffin's mother or brother; (3) Kassier failed to

adequately prepare other mitigation witnesses, and (4) Kassier failed to obtain an appropriate

psychiatric opinion.

a. Claim that Kassier was Ineffective for Not Seeking a Second Chair

Griffin claims that Kassier was ineffective for not seeking a second chair. This claim is

unexhausted because this is the first time that Griffin has raised this claim before any court and

there is no showing of cause or prejudice. When an unexhausted claim would be barred if

attempted to be presented in state court, a federal court can apply the state rules and bar the

claim, otherwise the exhaustion requirement would serve no purpose. Teague v. Lane, 489 U.S.

288, 297-99 (1991). Under Florida law, a petitioner is not permitted to file successive habeas

corpus petitions that seek the same relief as an earlier petition if the successive petition is based

upon circumstances that were known or should have been known when the previous petition was

filed. See Johnson v. Singletary, 647 So. 2d 106, 109 (Fla. 1994). Griffin has known since his

trial that Kassier did not seek a second chair. Accordingly, Griffin's claim is unexhausted. Even

if his claim were exhausted, the claim is without merit because Kassier's decision not to seek a

second chair does not fall below an objective standard of reasonableness and resulted in no

prejudice to Griffin.

> b. Claim that Kassier was Ineffective for Failing to Interview Griffin's Mother and Half-Brother

Griffin claims that Kassier provided ineffective assistance of counsel because he did not interview Griffin's mother, Maryann Griffin ("Maryann"), or his half-brother, Charles Griffin ("Charles"). This claim was exhausted in the post-conviction proceeding. Griffin contends that Kassier's failure to interview his mother and half-brother deprived him of important evidence in support of mitigation and deprived his mental health expert of information needed to draw accurate conclusions.

Under the Supreme Court's <u>Strickland</u> decision, ineffective assistance of counsel is only established if the defendant can prove that "counsel's performance was deficient. . .[,] [which] requires showing that counsel made errors so serious that counsel was not functioning as" counsel guaranteed by the Sixth Amendment. . . and "that the deficient performance prejudiced the defense...[,][which] requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).

> When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. More specific guidelines are not appropriate. The Sixth Amendment refers simply to "counsel," not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.

<u>Id.</u>, at 687-88 (internal citation omitted).

21

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Id. at 689 (internal quotation marks omitted).

These standards require no special amplification in order to define counsel's duty to investigate . . . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.

Id. at 690-91.

In preparation for the penalty phase of the trial, Kassier sought pertinent information from

Griffin himself, and interviewed Griffin's father and uncle, and a number of people who knew

Griffin. During the course of this investigation, Kassier learned that Griffin's mother Maryann

had been mentally ill for much of her life and had very little involvement in his upbringing.

Given Maryann's long-term mental illness, her limited contact with Griffin during his childhood,

and the likelihood that Maryann would not have been available to testify due to her health,

Kassier's strategic decision not to meet with her was reasonable. Furthermore, it does not appear

that Griffin provided details concerning his upbringing or family life that was grossly inconsistent with the information Kassier obtained from Clarence Griffin ("Clarence"), Griffin's father, thereby alerting Kassier that additional testimony may be necessary to paint a complete picture. Finally, although Maryann's testimony at the post-conviction hearing cannot be directly factored into the reasonableness of Kassier's prior decision not to interview her, Maryann's poor memory and tendency to become confused and contradict herself is consistent with Kassier's initial conclusion that Maryann's participation would not be helpful. Therefore, Kassier's decision not to interview Maryann did not fall below an objective standard of reasonableness.

Griffin also asserts that Kassier's decision not to locate and interview Charles was unreasonable. During the course of his investigation, Kassier learned that Griffin had a half-brother, Charles, but that Charles could not be located and that Griffin and Charles had not lived together for much of their lives. Kassier's strategic decision not to continue to try to locate Charles was not unreasonable. Based on Kassier's interviews with Griffin and Clarence, Kassier was not presented with inconsistencies that would alert him that additional information from Charles was necessary. Although Charles had firsthand knowledge of some aspects of Griffin's childhood, it was reasonable for Kassier to believe that Charles could not offer additional information that would not be cumulative or that would significantly bolster Griffin's case for mitigation. Moreover, despite the absence of Charles' testimony at the penalty phase, the trial court judge still found Griffin's traumatic childhood to be a non-statutory mitigator. In doing so, the judge specifically acknowledged that Griffin "liv[ed] under deplorable conditions with his alcoholic father," thereby accounting for Griffin's difficulties with his father within the traumatic

23

childhood non-statutory mitigator. Therefore, Kassier's decision not to seek out Charles at the penalty phase did not fall below an objective standard of reasonableness.

> c. Claim that Kassier Did Not Adequately Prepare Other Mitigation Witnesses

Griffin claims that Kassier provided ineffective assistance of counsel by failing to adequately prepare other mitigation witnesses because he met with these witnesses briefly and at the last minute.[13] This claim is unexhausted because Griffin had the opportunity raise this claim on direct appeal or in his post-conviction proceeding but did not, and he has made no attempt to demonstrate cause or prejudice. Moreover, even if the claim were exhausted, it is without merit because it has been raised in a conclusory fashion, without presenting any meaningful factual circumstances concerning the allegedly defective preparation.

> d. Claim that Kassier Failed to Obtain an Adequate Psychiatric Opinion

Griffin claims that Kassier's attempt to obtain evidence of mental health mitigation was inadequate and constitutes ineffective assistance of counsel. This claim was exhausted in the post-conviction proceeding. Kassier obtained the assistance of Dr. Merry Haber ("Dr. Haber"), a clinical psychologist, to determine if Griffin's psychological condition could support mitigation at the penalty phase. Kassier had known Dr. Haber for five or six years, had worked with her in the past, and knew she was on the court-approved list of psychologists. Kassier provided Dr. Haber with Griffin's school records and asked her to evaluate Griffin to determine if any statutory or non-statutory mitigating factors would be available to him. After interviewing

---

[13]     These witnesses include Clarence Griffin, Betty Dobe, Randy Gage, Al Fuentes, Brenda Waters, Judy Baran, Mario Montejo, and Peggy Eckman.

Griffin and reviewing his school records, she advised Kassier that, in her opinion, Griffin did not qualify for any mitigators and that no further neuropsychological testing was necessary. Kassier subsequently decided not to seek the assistance of a neuropsychologist.[14]

Griffin contends that Dr. Haber's recommendation was flawed because she conducted inadequate testing of Griffin and because she formed her opinion in the absence of additional information that Kassier did not provide to her, including other records pertinent to Griffin's past and information concerning Griffin's childhood from other family members. There is no question that Dr. Haber was qualified to assess Griffin and no contention has been made to the contrary. Thus, the question is whether Dr. Haber's assessment was inadequate, either because she conducted insufficient testing or had inadequate information at her disposal to conduct an adequate psychological assessment. If so, the question arises as to whether Kassier unreasonably relied on her recommendation when he chose not to seek a neuropsychological assessment to determine if there was evidence available supporting mitigation.

This Court cannot conclude that Dr. Haber's assessment was inadequate, particularly in light of her qualifications as a psychological expert. While there may have been additional information available for Dr. Haber to assess had Kassier provided it to her, and although there are numerous tests that can be used to construct a psychological profile, Dr. Haber concluded that no additional evidence or tests were necessary to reach a reliable conclusion concerning the unavailability of mitigators. Under the circumstances, there was nothing so unusual about Dr.

---

[14]    Neuropsychology is the basic scientific discipline that studies the structure and function of the brain related to specific psychological processes and overt brain behaviors.

Haber's opinion that a reasonable attorney would have been obliged to reject it. Presumably, if

Dr. Haber needed additional information to formulate a reliable opinion, she would have asked

for it, and Kassier stated that if she had recommended additional testing or further evaluation by

a neuropsychologist he would have been willing to obtain it. Kassier had worked with Dr. Haber

in the past and she had been recommended by other former colleagues, thus giving Kassier at

least some additional context for believing that her professional opinion was reliable. Moreover,

although it can be said that in every situation additional testing may yield at least some additional

relevant information, the issue is whether such testing was likely to yield evidence supporting

mitigation. Here, Dr. Haber concluded that it would not and Kassier's reliance on her opinion

did not fall below an objective standard of reasonableness.

Prior to the post-conviction hearing, but after the penalty phase, Griffin was evaluated by

Dr. Jane Ansley ("Dr. Ansley"), who was retained by the state, and Dr. Ernest Bordini ("Dr.

Bordini"), who was retained by Griffin. These evaluations may not serve as direct evidence of

the reasonableness of Kassier's decision not to seek additional psychological assistance because

they were conducted after his decision was made. However, the results of these evaluations,

while not entirely consistent with Dr. Haber's recommendation, are nevertheless consistent with

Kassier's decision not to seek further psychological assistance.

Dr. Bordini, a neuropsychologist, reviewed Griffin's school records, medical records,

prison records, police reports, depositions of family members, and testing performed by Dr.

Hyman Eisentstein ("Dr. Eisenstein"). Dr. Bordini also conducted his own tests. Dr. Bordini

concluded that Griffin had something wrong with the right side of his brain and other issues

consistent with frontal lobe problems. Dr. Bordini also concluded that overall, Griffin's executive functioning demonstrated at least low impairment and probably moderate impairment and that he had a mood disorder due to head trauma. Dr. Bordini also found that Clarence's alcoholism, Maryann's mental illness, the difficulty of Griffin's birth, a report of a skull fracture and broken collarbone, possibly from having been shaken as a baby, were risk factors of neuropsychological problems that supported his conclusions.

Dr. Bordini also opined that Griffin suffered from attention deficit hyperactivity disorder, a conduct disorder, intermittent explosive disorder, and bipolar disorder not otherwise specified. Ultimately, Dr. Bordini concluded that Griffin was acting under extreme emotional disturbance at the time of the murder and that he should qualify for the extreme emotional disturbance mitigator, pursuant to § 921.141(6)(b), Florida Statutes. Dr. Bordini disagreed with Dr. Ansley's conclusions and felt that her testing and clinical interview were inadequate. Dr. Bordini also believed that Dr. Haber had conducted an inadequate clinical interview with Griffin.

Dr. Ansley, a neuropsychologist also assessed Griffin. In doing so, she reviewed Griffin's school records, prison records, police reports, testing performed by Dr. Eisenstein, and Dr. Bordini's report and deposition. Dr. Ansley also performed a clinical evaluation of Griffin. After completing her review, Dr. Ansley concluded that Griffin did not suffer from any major neuropsychological deficits. This conclusion was based in part on her opinion that there was an absence of evidence of a significant neurological event, brain injury or seizure disorder. Dr. Ansley disagreed with Dr. Bordini's conclusion that Griffin had something wrong with the right side of his brain because the test Dr. Bordini relied on in reaching that conclusion was performed

27

by Griffin at a level above average when administered by Dr. Eisenstein.

Dr. Ansely also disagreed with Dr. Bordini's assessment of Griffin because Griffin's tests did not demonstrate a pattern associated with certain kinds of brain damage. She stated that most of Griffin's test results demonstrated unimpaired findings with a smattering of test results in the mildly to severely impaired range. Dr. Ansley concluded that these aberrations were most likely attributable to circumstances associated with the administration of the test, such as when Griffin got angry during a test administered by Dr. Eisenstein. She did not, however, believe that the aberrant results in the impaired range evinced brain damage or frontal lobe impairment.

Dr. Ansley disagreed with Dr. Bordini's conclusion that Griffin had any executive functioning deficit. She also disagreed with Dr. Bordini's diagnosis of attention deficit hyperactivity disorder, intermittent explosive disorder, mood disorder due to head trauma and bipolar disorder not otherwise specified. Dr. Ansley concluded that Griffin had a personality disorder with anti-social and narcissistic tendencies and a learning disorder, but no major neuropsychological deficits. Dr. Ansley opined that a competent clinical psychologist would not have recommended that Griffin be referred to a neuropsychologist because he did not manifest signs of a neuropsychological deficit that clinical psychologists are trained to look for.

Dr. Bordini and Dr. Ansley sharply disagree about Griffin's neuropsychological condition. However, the purpose of this inquiry is not to reach an objective conclusion about whether Griffin has a neuropsychological deficit. Rather, the question is whether Kassier's decision not to seek a neuropsychological evaluation fell below an objective standard of reasonableness. Perhaps if numerous neuropsychologists were in unanimous agreement that

28

Griffin had a neuropsychological deficit warranting a statutory mitigator, if Dr. Haber should have identified red flags alerting her to a possible neuropsychological deficit, and if Kassier had reason to know that Dr. Haber's assessment was flawed, Kassier's conduct would have fallen below an objective standard of reasonableness.

Instead, the disagreement between Dr. Bordini and Dr. Ansley supports the conclusion that Dr. Haber's assessment was reasonable, given that two qualified neuropsychologists ultimately disagreed on Griffin's neuropsychological condition. In the absence of any reason on Kassier's part to believe that Dr. Haber's assessment was defective, and in light of the fact that qualified experts disagree on Griffin's neuropsychological condition and the accuracy of Dr. Haber's conclusion, Kassier's decision not to seek a neuropsychological assessment was reasonable and did not constitute ineffective assistance of counsel.

2.      Claim that the Sentencing Court Did Not Independently Consider and Weigh the Aggravating and Mitigating Factors, and that Trial Counsel was Ineffective for Failing to Object

In his second claim, Griffin raises a number of issues, including: (1) improper ex parte contact between the prosecutor and the judge; (2) improper verbatim use of the prosecutor's sentencing memo in the sentencing order; and (3) the cold, calculated and premeditated aggravator was contrary to the judge's verbal statement.

a. Claim of Improper Ex Parte Contact

Griffin claims that the prosecutor had improper ex parte contact with the Judge. This claim was exhausted in the post-conviction proceeding. Prior to the penalty phase, Penny Brill ("Brill"), an attorney in the Legal Division of the State Attorney's Office, was asked to draft a

sentencing memo concerning Griffin.  Kassier testified at the post-conviction hearing that the

trial judge asked both sides to prepare a sentencing memo.  Brill stated in the post-conviction

hearing that she drafted the memo and provided a copy to the trial judge and to Kassier, although

service to Kassier was not reflected on the memo.  Brill also stated that she had no contact with

the trial judge while she drafted the memo.  Kassier had a full and fair opportunity to consider the

material contained in the sentencing memo because he received a copy of it.  Furthermore, given

that both Parties agreed that the trial court judge asked for the sentencing memos, and Brill

provided the state's sentencing memo to Kassier, no improper ex parte contact occurred because

Brill had no ex parte contact with the trial judge and Kassier was provided with a copy of the

memo.

> b.  Griffin's Claim of Improper Verbatim Use of the Sentencing Memo in the
> Sentencing Order

Griffin claims that it was improper for the trial court to utilize the sentencing memo in the

sentencing order.  This claim was exhausted in the post-conviction proceeding.  It is not improper

for a trial court to use a sentencing memo, even if it is used verbatim, as long as the judge

independently weighs the aggravating and mitigating circumstances.  Blackwelder v. State, 851

So. 2d 650, 653 (Fla. 2003) (stating that although not the best practice, a trial court's verbatim

use of a sentencing memo is not improper as long as the trial court independently weighed the

aggravating and mitigating circumstances) (citing Morton v. Florida, 789 So. 2d 324, 334 (Fla.

2001)); Walton v. State, 847 So.2d 438, 446-47 (Fla. 2003) (finding that trial court' s verbatim

use of sentencing memo was not improper because the record did not reflect that trial judge had

abdicated his responsibility of weighing the aggravators and mitigators and there was no improper ex parte contact) cf. State v. Riechmann, 777 So. 2d 342, 351 (Fla. 2000) (remanding for resentencing where trial judge made ex parte request to prosecutor to prepare sentencing memo, the memo was adopted verbatim into the sentencing order, and there were no statements by the judge that satisfied the process of weighing aggravators and mitigators as required by § 921.141(3), Florida Statutes); Patterson v. State, 513 So. 2d 1257, 1262-63 (Fla. 1997) (remanding for resentencing where trial judge failed to independently weigh aggravators and mitigators by delegating to prosecutor responsibility to prepare sentencing order without any direction, and the record reflected that the trial judge did not make findings or conduct the necessary process of weighing aggravators and mitigators because he stated at the sentencing hearing only that the aggravators outweighed the mitigators without specifically identifying the applicable aggravating and mitigating circumstances); see also Anderson v. City of Bessemer City, 470 U.S. 564, 572 (1985) (stating that "even when the trial court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous").

Here, Brill stated in the post-conviction hearing that her sentencing memo did not suggest how the judge should weigh the aggravators and mitigators. Moreover, the sentencing memo contained aggravators, but no mitigators. (dkt # 23-2). The trial judge independently concluded that certain mitigators existed and conducted his own weighing of the aggravators and mitigators. Thus the judge did not abdicate his statutory responsibility to weigh the aggravators and mitigators when he concluded that the aggravators outweighed the mitigators. Moreover, the entry of the sentencing order directly after Griffin's statement to the court does not impugn the

31

sufficiency of the judge's weighing of the aggravators and mitigators because it is evident from

the immediate entry of the sentencing order that the judge engaged in the weighing process prior

to Griffin's statement and concluded after Griffin's statement that his findings remained

unchanged. Had his conclusions upon weighing the aggravators and mitigators been

substantively affected by Griffin's statement, the judge could have simply taken the time the

modify the sentencing order accordingly. Nor was there any improper ex parte contact here that

has often been the hallmark of improper reliance on a sentencing memo submitted by the state.

Therefore, the trial court's use of the sentencing memo was not improper.

> c. Claim that the Cold, Calculated and Premeditated Aggravator was Contrary to the Judge's Statement at Sentencing

Griffin claims that the cold, calculated, and premeditated ("CCP") aggravator was

contrary to the judge's statement at sentencing. This claim is unexhausted and Griffin has

demonstrated no cause or prejudice. During the sentencing, following Griffin's statement to the

court, the trial court judge stated: "I am amazed that [Mr. Kassier] allowed you to say what he

allowed you to say because the jury probably didn't convict you on premeditated first degree

murder, they convicted you on felony murder." (App. X, Vol. 20 at 3862). Griffin argues that in

light of this statement, the trial court erred in applying the CCP aggravator.

On direct appeal, Griffin argued that the evidence did not support the CCP aggravator.

Griffin, 639 So. 2d at 971-72. However, this argument is entirely distinct from the contention

that the trial court judge's statement made the application of the CCP aggravator impermissible.

Therefore, this claim is unexhausted. However, even if the claim were exhausted, it is without

merit because a trial judge's impromptu statement during sentencing is insufficient to contravene

a sentencing order that is the product of an independent weighing of aggravators and mitigators.

Moreover, the trial judge's statement does not preclude him from finding that the murder was

committed in a cold, calculated and premeditated manner.  This finding is not inconsistent with

the application of the CCP aggravator because the statement pertains to the judge's perception of

the basis of the jury's verdict and is unrelated to his own weighing of the aggravators and

mitigators.

      3.      Claim that He was Denied Effective Assistance of Counsel at the Guilt
              Phase

Griffin claims that Kassier provided ineffective assistance of counsel by (1) failing to

adequately voir dire; (2) failing to move for change of venue; (3) failing to conduct adequate

cross-examination; (4) failing to seek the judge's recusal; and (5) conceding guilt in the opening

arguments.

        a. Claim of Failure to Adequately Voir Dire

Griffin claims that counsel was ineffective because (1) the jury venire was not adequately

questioned about pretrial publicity, their feelings concerning the death penalty, and their feelings

about mitigation factors; and (2) counsel failed to use a for cause challenge to remove a

prospective juror who expressed concerns about bias.  These claims were exhausted in the post-

conviction proceeding.  Here, Kassier raised the issue of pretrial publicity prior to voir dire and

the judge asked the jurors if they had heard about the case.  Numerous jurors responded that they

had and each was questioned concerning their knowledge of the case.  Three jurors were excused

for cause based on their responses. The remainder stated that they had not formed an opinion about the case and would decide the case based on the evidence presented at trial. Therefore, counsel was not ineffective with respect to examining the jury venire about pretrial publicity.

The jurors were also questioned by the prosecutor and Kassier about their views regarding the death penalty and mitigation. Eight jurors were excused because of their strong views concerning the death penalty. Griffin's habeas petition does not specify why this examination into the jury venire's views of the death penalty and mitigation was inadequate and this Court is unable to ascertain any defect. Thus, counsel was not ineffective with respect to the examination of the jury venire's views of the death penalty and mitigation.

Griffin also claims that Kassier was ineffective by failing to use a for cause challenge to remove prospective juror Cabrera when she indicated that she was unsure if she could be impartial. As an initial matter, this claim is without merit because juror Cabrera was ultimately dismissed through a peremptory challenge and there is no evidence that her dismissal through a for cause challenge could satisfy <u>Strickland</u>'s prejudice prong. Cabrera stated that she had worked as an intern at the State Attorney's Office, that her fiancé was an FBI agent, and that she had friends who were law enforcement officers. Although Cabrera stated that her subconscious might have some bearing on her ability to be impartial, upon further questioning she provided sufficient assurances that she could serve as an impartial juror. Therefore, counsel was not ineffective for failing to remove Cabrera using a for cause challenge.

b. Claim that Counsel was Ineffective for Failing to Move for a Change of Venue

Griffin claims that counsel was ineffective for failing to request a change of venue. This

34

claim was exhausted in the post-conviction proceeding. In order to prevail on an ineffective

assistance of counsel claim based on failure to seek a change of venue, a petitioner must

overcome the presumption of deference to which defense counsel's strategic decisions are

entitled, and demonstrate, at a minimum, that there is a reasonable probability that the motion

would have, or should have, been granted. Meeks v. Moore, 216 F.3d 951, 961 (2000). Kassier

raised the issue of pretrial publicity prior to voir dire. The trial judge stated that if choosing an

impartial jury proved impossible in Dade County, a jury would be selected elsewhere, brought to

Dade County, and sequestered. It is clear that the trial judge had taken measures to ensure that an

impartial jury would be seated, thereby obviating the need for a change of venue. Therefore,

there is not a reasonable probability that the motion would have, or should have, been granted

and counsel was not ineffective for failing to seek a change of venue.

> c. Claim that Counsel was Ineffective for Failure to Conduct Adequate Cross-
> Examination

Griffin claims that counsel was ineffective for failing to adequately cross-examine co-

defendant Tarallo and Officer Crespo. Griffin contends the Kassier should have highlighted that

Tarallo had stated at his suppression hearing that his statement to police had not been made

voluntarily but because he was scared, and that Kassier failed to bring to the jury's attention the

portion of his plea agreement that required him to testify consistent with the statement he made

to police. Griffin also asserts that Kassier should have questioned Officer Crespo about his state

of mind after the shooting, the amount of time that passed between the shooting and Officer

Crespo's statement to police, his consultation with an attorney prior to making his statement to

police, and about the shots that Officer Crespo fired from inside his vehicle, which Griffin believes lends credence to his version of events that the Officers fired first.

Griffin's arguments concerning cross-examination amount to an attempt to improve the quality of the cross-examination by relying on the benefit of hindsight. While Kassier may not have asked every question that Griffin now feels might have been fruitful in some way, Kassier's failure to have met Griffin's present view of an optimal cross-examination does not amount to ineffective assistance of counsel. See Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (stating that a criminal defendant is not entitled to error-free representation, only to representation that falls within a range of competence required of attorneys in criminal cases); Moore v. Beto, 458 F.2d 386, 386-87 (5th Cir. 1972) (stating that a criminal defendant is not entitled to error-free counsel or subjectively satisfactory results). None of the proposed questions to Tarallo or Officer Crespo are so central to an adequate defense that a failure to ask them falls below an objective standard of reasonableness, particularly in light of all the evidence presented. For instance, although Kassier did not ask Officer Crespo about the shots fired from inside his patrol car, Tarallo testified that Griffin fired the first shot and expert ballistic testimony was presented demonstrating the Officer Crespo fired from inside his vehicle. Kassier also tried to elicit testimony from Tarallo that his testimony inculpating Griffin was untruthful but was unsuccessful. Therefore, Kassier's cross-examinations of Tarallo and Officer Crespo did not fall below an objective standard of reasonableness and did not constitute ineffective assistance of counsel.

### d. Claim that Counsel was Ineffective for Failure to Seek Recusal Based on Judicial Bias

Griffin claims that Kassier was ineffective for failing to seek recusal based on judicial bias. Griffin claims that judicial bias was manifested by (1) the fact that Griffin had appeared before the judge previously on an unrelated matter; (2) ex parte comments by the trial judge to the victim's father; and (3) the fact that the judge was a friend of the victim's father. In order to prevail on an ineffective assistance of counsel claim for failure to seek recusal based on judicial bias, a petitioner must overcome the presumption of deference to which defense counsel's strategic decisions are entitled, and demonstrate, at a minimum, that there is a reasonable probability that the motion would have, or should have, been granted. See Meeks v. Moore, 216 F.3d 951, 961 (2000). Griffin's claims of ineffective assistance based on Kassier's failure to seek recusal because of Griffin having appeared before the trial judge previously and on statements made by the trial judge to the victim's father were exhausted during the post-conviction proceeding. Griffin's ineffective assistance claim based on Kassier's failure to seek recusal because of the trial judge's alleged friendship with the victim's father is unexhausted and no attempt has been made to demonstrate cause or prejudice.

Griffin's claim that Kassier was ineffective for failing to seek recusal based on previous statements made by the trial judge when Griffin appeared before him on another matter is without merit. "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair

judgment impossible." Liteky v. U.S., 510 U.S. 540, 555 (1994). The trial judge's statement in a prior proceeding to the effect that he believed Griffin would continue committing crimes is not evidence of bias sufficient to warrant recusal. The trial judge's prediction that Griffin would continue violating the law manifests a lack of optimism that Griffin's interactions with the judiciary or the penal system would have a meaningful rehabilitative or deterrent effect on Griffin. Such a statement, however, manifests no bias towards Griffin.

While the judge's comment indicates pessimism that Griffin would cease engaging in criminal activity, it is merely an observation concerning Griffin's likely future conduct and does not suggest that the judge was biased or harbored any deep-seated favoritism or antagonism towards Griffin. Nor is there is anything inherently suspect about a judge presiding over an accused's criminal trial and sentencing, where the judge has previously conducted a trial and sentencing of the same defendant on separate offenses. Compare In re Murchinson, 349 U.S. 133, 136 (1955) (finding that judge's participation under state law in determination of whether charges should be brought against defendants required recusal at the trial stage). Although the trial judge's prediction turned out to be accurate, and therefore the judge may have been unsurprised that Griffin was before the Court on more serious charges, there is no evidence to suggest that the trial judge harbored any bias towards Griffin warranting recusal. Therefore, there is not a reasonable probability that a motion for recusal would have, or should have, been granted.

Griffin's claim that Kassier was ineffective because he failed to seek recusal based on alleged ex parte statements by the trial judge to the victim's father is without merit. Before the

38

trial, while discussing a continuance of the trial date, and at the request of counsel, the trial judge

offered to speak with the victim's father in chambers to explain the reason for the delay of the

trial date. (App. X, Vol. 4 at 740). As an initial matter, there is no evidence that such a

conversation actually occurred. However, even assuming that the judge explained to the victim's

father the reason for the continuance, this does not suggest deep-seated favoritism or antagonism

on the part of the judge that warrants recusal, nor is it even indicative of impropriety. Therefore,

there is not a reasonable probability that a motion for recusal would have, or should have, been

granted.

    Although Griffin's ineffective assistance of counsel claim based on the judge's alleged

friendship with the victim's father is unexhausted, it is also without merit. Griffin argues that

this claim is supported by the judge's offer to explain the reason for the continuance of trial to

the victim's father. As stated above, this is an insufficient ground to support recusal or a claim of

ineffective assistance of counsel claim based on failure to seek recusal. During the post-

conviction hearing, Griffin's post-conviction counsel asked Kassier if he ever told his

investigator that Griffin had no chance because the judge was a friend of the victim's father. The

state objected and the objection was sustained on grounds that counsel was attempting to raise

additional grounds for ineffective assistance of counsel claims not before the court. Griffin

provides no other support for his allegation of judicial bias based on a relationship between the

judge and the victim's father. These grounds are insufficient to support an ineffective assistance

of counsel claim based on Kassier's failure to seek recusal because there is not a reasonable

probability that a motion for recusal would have, or should have, been granted. Therefore,

Griffin's claims that counsel was ineffective for failure to seek the trial judge's recusal based on bias are without merit.

e. Claim that Counsel was Ineffective for Conceding Guilt in Opening Argument

Griffin's claim that Kassier was ineffective because he conceded Griffin's guilt in his opening argument is without merit. This claim was exhausted in the post-conviction proceeding. There was no question at the outset of Griffin's trial that he shot and killed Officer Martin and there is no suggestion that Kassier should have, or could have, argued otherwise. At issue were the circumstances of the slaying of Officer Martin, and Kassier's opening statement did not compromise Griffin's ability to persuade the jury that they should find Griffin guilty of a lesser offense. Moreover, it is often considered good trial strategy to concede guilt as to some of the charged offenses to gain credibility with the jury. McNeal v. State, 409 So. 2d 528, 529 (Fla. 5th DCA 1982). Therefore, Kassier was not ineffective for conceding that Griffin shot and killed Officer Martin. No evidentiary hearing is necessary to resolve Griffin's ineffective assistance of counsel claims because a factual basis for the claims was adequately established in state court and none of the conditions of 28 U.S.C. § 2254(e)(2) apply.

4.    Claim that the Use of Non-Statutory Aggravators and Other Improper Prosecutorial Argument Deprived Mr. Griffin of His Constitutional Rights and Trial Counsel Rendered Ineffective Assistance of Counsel in Failing to Object to Improper Arguments Made by the Prosecution.

Griffin claims that (1) the introduction of Williams rule evidence[15] was improper; (2) that

---

[15]    Williams rule evidence is "[s]imilar fact evidence of other crimes, wrongs, or acts [that] is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but [that] is inadmissible when the evidence is relevant solely to prove bad character or propensity." § 90.404(2)(a), Fla. Stat.

the prosecutor made improper statements concerning mitigation, and (3) that counsel was
ineffective for failing to object to both of these deficiencies.

>a. Claim that <u>Williams</u> Rule Evidence was Improperly Admitted and that Kassier
>was Ineffective for Failing to Object

Griffin's claims concerning the introduction of <u>Williams</u> rule evidence was exhausted on
direct appeal. In the instant habeas petition, Griffin provides no factual details concerning the
specific <u>Williams</u> rule evidence that was admitted at trial which allegedly violated his
constitutional rights. Therefore, this Court is unable to ascertain which <u>Williams</u> rule evidence
was admitted at trial that Griffin now contends was improper. On direct appeal, however, Griffin
took issue with a number of instances of <u>Williams</u> rule evidence that he contends was improperly
admitted. The Florida Supreme Court made clear, and this Court agrees, that the evidence
involving the stolen Chrysler LeBaron, the home invasion robbery in which Griffin acquired the
murder weapon, and the unsuccessful foray into the apartment complex, did not involve
<u>Williams</u> rule evidence because they involved evidence that was inextricably intertwined with the
charges before the jury or were necessary to paint a complete picture of events surrounding the
charged crimes. Tarallo's testimony of another stolen car was not preserved for appellate review
and is procedurally barred, given that there has been no showing of cause or prejudice.

Tarallo also testified that Griffin told Tarallo and Velez that they should go to the Holiday
Inn because "he had got paid there five hundred times," meaning he had successfully committed
robberies there previously. <u>Griffin</u>, 639 So. 2d 970. This testimony concerning other robberies
was not inextricably intertwined with any charges before the jury, but was admissible to prove

other facts in issue, including motive, opportunity, intent, preparation, plan, knowledge, and absence of mistake or accident. Moreover, even assuming this evidence was not admissible, this Court cannot conclude that the admission of this testimony "had [a] substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). There was other overwhelming evidence presented that Griffin robbed the hotel room at the Holiday Inn and stole the keys to the Chrylser LeBaron and the car itself, that he acquired the murder weapon in a home invasion, and that he fired the shot that killed Officer Martin. Therefore, this testimony could not have had a substantial effect on the jury's verdict concerning the charged offenses.

Nor is it evident that Tarallo's statement could have had a substantial effect on the jury during the sentencing phase. Testimony concerning Griffin's statement about past robberies at the Holiday Inn was limited to Tarallo's testimony, and the state did not meaningfully rely on it and did not use the statement in closing arguments. Moreover, the statement was ambiguous in that it was phrased as slang. Additionally, given the overwhelming evidence supporting the charged offenses, the attenuation between the time of the testimony and the penalty phase, and the absence of a reference to the testimony at the penalty phase, the admission of the testimony did not have a substantial and injurious effect or influence in determining the jury's verdict. Therefore, Griffin's claims concerning the admission of Williams rule evidence are without merit.

Griffin also claims that Kassier was ineffective for failing to object to the admission of Williams rule evidence. This claim is unexhausted and therefore barred because Griffin has

demonstrated no cause or prejudice. Even if the claim was exhausted, Kassier was not ineffective. Given that the evidence involving the stolen Chrysler LeBaron, the home invasion robbery in which Griffin acquired the murder weapon, and the unsuccessful foray into the apartment complex, did not involve <u>Williams</u> rule evidence, Kassier had no basis to object. Furthermore, Kassier objected to the testimony concerning past robberies at the Holiday Inn. Therefore, he was not ineffective because raising an objection was all that was required of him. Kassier was also not ineffective for failing to object to Tarallo's testimony concerning another stolen car because that testimony was not <u>Williams</u> rule evidence and was inextricably intertwined with the charges before the jury and was necessary to paint a complete picture of events surrounding the charged crimes. Therefore, Griffin's ineffective assistance claim involving Kassier's failure to object to the admission of <u>Williams</u> rule evidence is without merit.

> b. Claim That Prosecutorial Argument was Improper and that Counsel was Ineffective for Failure to Object

Griffin claims that the prosecutor made improper arguments concerning mitigation and non-statutory aggravation and that Kassier was ineffective for failing to object. Griffin contends that the prosecutor's argument was improper because it mischaracterized mitigation as shifting blame from Griffin to another person. During the penalty phase, the prosecutor made the following four statements concerning mitigation. "Are you reasonably convinced that this murderer's father's alcoholism led him to kill Officer Joseph Martin?" (App. X, Vol. 20 at 3796). "Are you reasonably convinced that this murderer had an emotional handicap that caused him to shoot and kill Officer Joseph Martin?" (App. X, Vol. 20 at 3796-97). "All of this

evidence presented in mitigation has suggested to you is that the killing of Officer Joe Martin is everyone's fault but the murderer's. It's his mother's fault for leaving, it's his father's fault for being an alcoholic, it is the fault of the Blue Moon Motel; it is Brenda Water's fault." (App. X, Vol. 20 at 3801). "Recommend that I be allowed to live out my natural life, not because I am truly remorseful, not because I committed a terrible crime, but because this murderer, not Jose Martin, is the victim in this case." (App. X, Vol. 20 at 3802-03). Kassier did not object to these statements. Therefore, they could not be raised on direct appeal or in a proceeding for post-conviction relief and are procedurally barred, because there has been no showing of cause or prejudice.

Griffin's claim that the prosecutor's argument concerning mitigation was improper is also without merit. The above-referenced prosecutor's arguments challenge the proposition that Griffin's family, life circumstances and mental condition were factors that should be considered by the jury as they weighed aggravators and mitigators. The phrasing of the prosecutor's argument implied that the jury should have considered whether other people or conditions caused Griffin to kill Officer Martin. A more articulate statement would have suggested that the jury should consider whether certain circumstances, including Clarence's alcoholism, his mother's absenteeism, and his mental condition, ultimately reduced, or mitigated his culpability for the charged offenses. It is not uncommon for prosecutors and for defense counsel to use all manner of rhetorical devices in communicating their views to the jury. It is only when these rhetorical devices are seriously misleading or patently egregious that prejudice results. Here, while the prosecutor's statements were inarticulate, they were not so defective as to prejudice Griffin.

Therefore, Griffin's claim is without merit.

Griffin also claims that Kassier was ineffective for failing to object to these statements. The prosecutor's statements were not of a nature that any reasonable attorney should have objected to them. Even so, the statements resulted in no prejudice to Griffin. Therefore, Kassier was not ineffective for failing to object.

Griffin also claims that Kassier was ineffective for failing to object to the prosecutor's statements allegedly involving improper non-statutory aggravation and golden rule arguments. Kassier objected to these statements. His assistance therefore could not have been ineffective because raising an objection to improper argument is all that is generally required of trial counsel. Therefore, Griffin's claims concerning improper prosecutorial arguments and ineffective assistance for failure to object are without merit.

> 5.    Claim that the Trial Court Erred in Preventing the Defense from Eliciting Testimony of his Remorse, which Constitutes a Valid Mitigating Factor to be Considered by the Sentencer as Providing a Basis for a Life Sentence

Griffin claims that the trial court erred by excluding hearsay statements of witnesses who would have testified concerning Griffin's remorse. This claim was exhausted on direct appeal. Assuming, without deciding, that the trial court erred in excluding the testimony, the error did not have a substantial and injurious effect or influence on the jury. See Brecht, 507 U.S. at 623. The trial judge found remorse as a non-statutory mitigating factor. Therefore, the exclusion of testimony pertaining to remorse was harmless and Griffin's claim is without merit.

6.    Claim that Griffin's Sentence is Predicated upon an Aggravating Circumstance that was Applied in Vague and Overbroad Fashion When it was Used to Support a Sentence of Death

Griffin claims that the cold, calculated, and premeditated ("CCP") aggravator was contrary to the judge's statement at sentencing. This claim is unexhausted and there has been no showing of cause or prejudice. Although Griffin has raised a number of arguments against the application of the CCP aggravator, he has never raised this argument and therefore it has not been fairly exhausted. Even if the claim was exhausted, it is without merit. At sentencing, the trial judge stated: "I am amazed that [Mr. Kassier] allowed you to say what he allowed you to say because the jury probably didn't convict you on premeditated first degree murder, they convicted you on felony murder." (App. X, Vol. 20 at 3862). Griffin argues that in light of this statement, the trial court erred in applying the CCP aggravator because its application was inconsistent with the judge's statement. The trial judge's statement is not inconsistent with the application of the CCP aggravator because the judge's perception concerning the basis of the jury's verdict is not germane to his own finding concerning the CCP aggravator. Thus, his statement is not inconsistent with his finding that the murder was committed in a cold, calculated and premeditated manner. Moreover, the judge's finding concerning the CCP aggravator was supported by evidence that Griffin intended to fire upon police rather than return to jail. See (App. X, Vol. 14 at 2489, 2511-12). Therefore, Griffin's claim is without merit.

7.    Griffin's Sentence is Predicated Upon an Improper Automatic Aggravator

Griffin claims that Florida's felony murder aggravating circumstance is unconstitutional because it does not genuinely narrow the class of persons eligible for the death penalty. This

claim is barred because it was not objected to at sentencing, was not raised on direct appeal, and as the post-conviction court and the Florida Supreme Court found, is procedurally barred. Notwithstanding, even if the claim were not barred, the application of Florida's felony murder aggravating circumstance is not an unreasonable application of clearly established law. The Eleventh Circuit Court of Appeals has squarely decided that application of Florida's felony murder aggravating circumstance is not unconstitutional because it "genuinely narrows the class of persons eligible for the death penalty." Johnson v. Dugger, 932 F.2d 1360, 1369 (11th Cir. 1991). This conclusion is not in direct conflict with any decision of the Supreme Court of the United States. Therefore, Griffin's claim is without merit.

       8.     Claim that Appellate Counsel Failed to Raise or Adequately Raise Numerous Meritorious Issues Which Warrant Reversal of Griffin's Conviction

Griffin claims that appellate counsel was ineffective for (1) failing to argue that the exclusion of the hearsay remorse testimony was improper; (2) failing to argue that the judge's statement concerning the moving nature of Griffin's statement at sentencing was inconsistent with the exclusion of the hearsay remorse testimony; (3) failing to argue that the judge's statement concerning the moving nature of Griffin's statement at sentencing was inconsistent with the application of the CCP aggravator; and (4) failing to argue that the prosecutor's statement that "[w]e would rather risk a reversal than risk an acquittal" was improper. (App. X, Vol. 17 at 3098-99).

These claims were not raised in state court until long after the Florida Supreme Court ruled on the appeal of Griffin's post-conviction motion, thereby concluding his post-conviction

proceeding in state court. Rather, Griffin raised these claims before the Florida Supreme Court in a Petition to Invoke All Writs Jurisdiction, filed on November 21, 2008, after he filed the instant motion for habeas relief. Griffin's Petition for All Writs Jurisdiction is currently pending before the Florida Supreme Court. Given that Griffin's post-conviction proceeding has concluded, these claims are unexhausted and there has been no showing of cause or prejudice. Moreover, Florida law requires that "[i]n death penalty cases, all petitions for extraordinary relief over which the supreme court has original jurisdiction, including petitions for writ of habeas corpus, shall be filed simultaneously with the initial brief in the appeal from the lower tribunal's order on the defendant's application for relief under Florida Rule of Criminal Procedure 3.851." Fla. R. App. P. 9.142(a)(5). Therefore, Griffin's pending petition is procedurally barred.

Even if the claims were exhausted, they are without merit. The claims relating to the exclusion of hearsay remorse testimony are without merit because the trial judge found remorse as a mitigating factor. Therefore, the exclusion of testimony intended to support a finding of remorse was harmless. Griffin's claim that appellate counsel was ineffective for not challenging the failure to argue that the trial judge's statement was inconsistent with application of the CCP aggravator is also without merit. Application of the CCP aggravator was challenged numerous times using a myriad of arguments. Appellate counsel's failure to raise this particular argument against application of the CCP aggravator did not fall below an objective standard of reasonableness and was of such marginal significance that it could not have resulted in prejudice. Furthermore, Griffin's claim that appellate counsel was ineffective for failing to challenge the prosecutor's statement concerning a mistrial is without merit because, at best, only ambiguous

48

and speculative inferences can be drawn from the statement. Therefore, appellate counsel's failure to raise this argument did not fall below an objective standard of reasonableness and was of such marginal significance that it could not have resulted in prejudice. Therefore, Griffin's claims are without merit.

9. Claim that the Existing Procedure Utilized by the State of Florida for Lethal Injection is Unconstitutional

Griffin claims that Florida's lethal injection protocol is unconstitutional because there is a demonstrated risk of severe pain. Griffin also claims that his inability to participate in a recent case in which the Florida Supreme Court upheld the constitutionality of Florida's lethal injection protocol violated his right to due process. As an initial matter, the Florida Supreme Court's decision in Lightbourne v. McCollum, upholding the constitutionality of Florida's lethal injection protocol, has no impact on Griffin's due process rights. 969 So. 2d 326 (Fla. 2007). Griffin's due process claim suggests that every death row prisoner in Florida has a due process right to participate as a party in every case in which the Florida lethal injection protocol is challenged. However, it is well established that a court, in this case the Florida Supreme Court, may conclusively resolve a challenge to the constitutionality of conduct by the state, without violating the due process rights of any citizen who has been, or may be, affected by the conduct at issue. Were this not the case, every death row prisoner in Florida would be an indispensable party every time a constitutional challenge related to Florida's death penalty is raised. This, clearly, is not the case. Therefore, in addition to being unexhausted, Griffin's due process claim is without merit.

Griffin's claim that Florida's death penalty protocol is unconstitutional is also without merit for a number of reasons. First, the claim is unexhausted and there is no showing of cause or prejudice. Second, a challenge to lethal injection procedures may not be raised in a habeas petition, and may only be brought in a § 1983 lawsuit. <u>Tompkins v. Sec'y, Dept. of Corr.</u>, 557 F.3d 1257, 1261 (11th Cir. 2009). Third, the claim is foreclosed by the Florida Supreme Court's decision in <u>Lightbourne</u>, the holding of which was not contrary to, or an unreasonable application of, clearly established United States Supreme Court precedent. 969 So. 2d at 352-53. Therefore, Griffin's claim is without merit.

## IV.    CONCLUSION

After review, this Court concludes that Griffin's claims are time barred. Moreover, each of his substantive claims are either procedurally barred or without merit. Even viewing all of his claims in the aggregate, this Court concludes that Griffin has presented no claims that entitle him to habeas relief.

For the foregoing reasons, it is

ORDERED AND ADJUDGED that Petitioner's Amended Petition for Writ of Habeas Corpus by a Person in State Custody (dkt # 17) is DENIED. The Clerk of the Court is instructed to CLOSE this case. All pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of August, 2009.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record

# APPENDIX A



# Griffin AEDPA Statute of Limitations Timeline